# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LUIS RAMIREZ, NORMA RAMIREZ,
and JACKIE MONTIJO, a minor,

      Plaintiffs,

v.                                          Civ. No. 15-1095 GBW/SCY

BOARD OF COUNTY COMMISSIONERS
OF SANTA FE COUNTY, *et al.*,

      Defendants.

## <u>ORDER GRANTING DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT</u>

This matter comes before the Court on the Motion for Summary Judgment Based on Qualified Immunity brought by Defendants Board of County Commissioners of Santa Fe County, Detective Paul Prentice, and Agent Eddie Webb. *Doc. 41*.[1] The Court has reviewed the Motion and related briefing (*docs. 45, 46*), and, being fully advised, will GRANT the Motion for the reasons set forth below.

---

[1] Plaintiffs named Agent Brian Nissen as a Defendant in their Amended Complaint (*see doc. 30*), but the docket indicates that Plaintiffs have failed to perfect service of process upon him. *See* FED. R. CIV. P. 4(l)(1) (Unless service is waived, proof of service must be made to the Court by the server's affidavit). The Court therefore lacks personal jurisdiction over putative Defendant Nissen, and he is not an official party to the action. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). Moreover, Defendants gave Plaintiffs notice of the lack of summons or service upon putative Defendant Nissen in their Motion for Summary Judgment, filed on August 15, 2016. *Doc. 41* at 1. Because more than ninety days have passed since Plaintiffs' Amended Complaint was filed (*see doc. 30*), and Plaintiffs have not given good cause for their failure to serve Brian Nissen since being put on notice, Plaintiffs' claims against Defendant Nissen will be dismissed without prejudice. FED. R. CIV. P. 4(m).

## I.     BACKGROUND

Plaintiffs' claims stem from the events surrounding the arrest of Plaintiff Norma Ramirez on October 25, 2013.  *See generally doc. 30.*  This matter was removed to federal court on December 3, 2015, and Plaintiffs filed their First Amended Complaint on April 12, 2016.  *Docs. 1, 30.*  In their Amended Complaint, Plaintiffs assert claims under 42 U.S.C. § 1983 against individual Defendants Paul Prentice, Eddie Webb, and Brian Nissen ("the individual Defendants") for the unconstitutional use of excessive force during the arrest of Plaintiff Norma Ramirez, and against Defendant Board of County Commissioners of Santa Fe County ("the municipal Defendant") on the basis of municipal liability for the individual defendants' actions.[2]  *See generally doc. 30.*

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'"  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the movant meets this burden, the non-moving party is required to designate specific

---

[2] Plaintiffs also included various claims based on the New Mexico Tort Claims Act as well as a claim for punitive damages in their Amended Complaint, but the Court dismissed them in its Order Granting Partial Summary Judgment on April 21, 2016.  *Doc. 34.*

facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324.

However, summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions.  This is so because qualified immunity is "designed to protect public officials from spending inordinate time and money defending erroneous suits at trial." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).  Therefore, when a public official is entitled to qualified immunity, the entitlement relieves the official from bearing any of the burdens of litigation, including discovery.  *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).  The Supreme Court "has directed the lower federal courts to apply qualified immunity broadly, to protect from civil liability for damages all officers except 'the plainly incompetent or those who knowingly violate the law,'" in order to avoid unduly inhibiting officers in performing their official duties.  *Wilson v. City of Lafayette*, 510 F. App'x 775, 780 (10th Cir. 2013) (unpublished) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986), and *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001)).  The qualified immunity standard allows government officials "ample room for mistaken judgments," shielding them from liability for reasonable error.  *Applewhite v. U.S. Air Force*, 995 F.2d 997, 1000 (10th Cir. 1993) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).  Thus, qualified immunity is

"applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

When a defendant moves for qualified immunity on an excessive force claim, the burden shifts to the plaintiff to show (1) "that the force used was impermissible (a constitutional violation)[,]" and (2) "that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007); *see also Medina*, 252 F.3d at 1128.  This is a "strict two-part test" that must be met before the defendant asserting qualified immunity again "bear[s] the traditional burden of the movant for summary judgment— showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Clark*, 513 F.3d at 1222.  The Court may address the two prongs of the test in any order.  *Pearson*, 555 U.S. at 236.

Determining whether the allegedly violated right was "clearly established" depends on whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (quotation omitted).  While the plaintiff need not locate "a case directly on point," nevertheless

4

"existing precedent must have placed the statutory or constitutional question beyond

debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Whether the motion for summary judgment is based on qualified immunity or

not, the Court decides the motion on the basis of the facts as construed in the light most

favorable to the non-moving party. Consequently, it must keep in mind three

principles. First, the Court's role is not to weigh the evidence, but to assess the

threshold issue of whether a genuine issue exists as to material facts requiring a trial.

*See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on

each side so that a rational trier of fact could resolve the issue either way. An issue of

fact is 'material' if under the substantive law it is essential to the proper disposition of

the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal

citation omitted). Second, the Court must resolve all reasonable inferences and doubts

in favor of the non-moving party, and construe all evidence in the light most favorable

to the non-moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *see also Riggins

v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (noting that courts generally "accept the

facts as the plaintiff alleges them" when considering whether a plaintiff has overcome

defendant's assertion of qualified immunity at the summary judgment stage).

However, "a plaintiff's version of the facts must find support in the record" at the

summary judgment stage. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at

255. "[T]o survive the . . . motion, [the non-movant] need only present evidence from which a jury might return a verdict in his favor." *Id*. at 257.

### III.   LEGAL STANDARD

### A.  Excessive Force

An excessive force claim arising in the context of an arrest or detainment of a free citizen invokes the protections of the Fourth Amendment's guarantee of citizens' right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Under the applicable Tenth Circuit rule, an excessive force claim cannot succeed unless a plaintiff can establish (1) that the officers "used greater force than would have been reasonably necessary to effect a lawful seizure," and (2) "some actual injury caused by the unreasonable seizure that is not *de minimis*, be it physical or emotional."  *Cortez*, 478 F.3d at 1129.[3]

The proper application of the Fourth Amendment test of reasonableness "requires careful attention to the facts and circumstances of each particular case[.]" *Graham*, 490 U.S. at 396.  Specifically, in balancing the nature of the intrusion on the a plaintiff's Fourth Amendment interests against the countervailing government interests

---

[3] Since *Cortez* was decided, the Tenth Circuit has indicated that the requirement of an actual injury that is more than *de minimis* to state an excessive force claim may apply "only in Fourth Amendment excessive force cases based on handcuffing."  *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1315 (10th Cir. 2015) (collecting Tenth Circuit cases and quoting the Supreme Court's directive in *Hudson v. McMillan*, 503 U.S. 1, 4 (1992) that courts should "decide excessive force claims based on the nature of the force rather than the extent of the injury").  Regardless, the *Cortez* rule is applicable to some extent in the present case, as Plaintiff Norma Ramirez does claim excessive force based on handcuffing.  For the non-handcuffing claims, the Court's ruling is not dependent upon the "more than *de minimis* injury" requirement.

at stake, the Court must consider (1) the severity of the crime at issue; (2) whether the

suspect poses an immediate threat to the safety of the officers or others; and (3) whether

the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Id.*

Whether a particular use of force was "reasonable" must be evaluated "from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight."  *Id.*  This evaluation is an objective one, requiring inquiry into the legal

reasonableness of the action at the time of the alleged violation, without regard for the

subjective motivations of the defendant.  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d

1179, 1186 (10th Cir. 2001); *see also Cortez*, 478 F.3d at 1125 ("An officer's evil intentions

will not make a Fourth Amendment violation out of an objectively reasonable use of

force; nor will an officer's good intentions make an objectively unreasonable use of force

constitutional.").

## B.  Municipal Liability

Municipalities cannot be held liable for the acts of their employees under 42

U.S.C. § 1983 on the basis of a *respondeat superior* theory of liability.  *Monell v. Dep't of*

*Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Bryson v. City of Okla. City*, 627 F.3d 784, 788

(10th Cir. 2010).  Instead, "[a] plaintiff suing a municipality under section 1983 for the

acts of one of its employees must prove: (1) that a municipal employee committed a

constitutional violation; and (2) that a municipal policy or custom was the moving force

behind the constitutional violation."  *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d

1313, 1316 (10th Cir. 1998).  In order to meet this burden, a plaintiff must first "identify a

government's policy or custom that caused the injury."  *Schneider v. City of Grand*

*Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (internal citation omitted).  The

plaintiff is then required to show "that the policy was enacted or maintained with

deliberate indifference to an almost inevitable constitutional injury."  *Id.*  The Tenth

Circuit has distilled these requirements into three specific elements: "(1) official policy

or custom[;] (2) causation[;] and (3) state of mind."  *Id.*

An official policy or custom may take five different forms.  *See Cacioppo v. Town of*

*Vail, Colo.*, 528 F. App'x 929, 931-32 (10th Cir. 2013).  Though Plaintiffs do not brief the

issue of municipal liability in their response to Defendants' Motion for Summary

Judgment (*see generally doc. 45*), Plaintiffs plead in their Complaint that the municipal

Defendant's "failure to adequately train and supervise County Deputies" demonstrated

its deliberate indifference to "grave constitutional injury to citizens" likely to result

from such failure.  *See doc. 30* at 8.  Plaintiffs also assert that the municipal Defendant's

actions "are [a]n act or omission of a final policymaker for which Defendant County

may be held liable."  *See doc. 30* at 9.  These allegations correspond to the third and fifth

forms of an official policy or custom enumerated by the Tenth Circuit—namely, "the

decisions of employees with final policymaking authority" and "the failure to

adequately train or supervise employees, so long as that failure results from deliberate

indifference to the injuries that may be caused."  528 F. App'x at 932.  Plaintiffs plead

that these "customs, practices, or policies" were the moving force behind the alleged constitutional violations.  *Doc. 30* at 9.

## IV.   UNDISPUTED FACTS

The Local Rules regarding Summary Judgment procedures require that a non-moving party's response to a Motion for Summary must contain:

> . . . a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.  The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).  Plaintiffs' response in opposition to Defendants' Motion for Summary Judgment challenged certain portions of Defendants' alleged undisputed facts numbered 15, 16, 17, and 18 in their summary judgment motion, but Plaintiffs did not include any additional material facts that they contend are disputed.  *See doc. 45* at 2-5.  The Court will therefore treat as undisputed all material facts enumerated in Defendants' Motion for Summary Judgment (*doc. 41*) other than the portions of Defendants' facts 15-18 that were specifically controverted by Plaintiffs.

1.   Defendant Paul Prentice has served as a Detective for the Sheriff's Office of Santa Fe County, New Mexico since 2013 and was acting under color of state law at all times material hereto.  *See doc. 41* at 4.

2.   Defendant Eddie Webb was employed by the Sheriff's Office of Santa Fe County as an Agent in the Warrants/Fugitives Division and was acting under color of state law at all times material hereto.  *Id.* at 7-8.

3.   On the afternoon of September 15, 2013, Luis Ramirez's ex-wife, Elizabeth Good, contacted the Santa Fe County Regional Emergency Communications Center to report that Luis Ramirez had threatened her life.  *Id.* at 4.

4.   During the September 15 call, Ms. Good made the following statements to Deputy Andrew Houlton:

   a.   Norma Ramirez had telephoned her at 2:00 AM that day to inform her that she overheard her husband Luis Ramirez say that he was going to hire someone to kill Ms. Good.  *Id.*

   b.   Luis Ramirez had a history of making threats, of violence, and of domestic abuse; that Luis Ramirez had been arrested earlier that same day as a result of a domestic dispute.  *Id.*

   c.   Norma Ramirez had indicated her willingness to testify

against Luis Ramirez in court regarding the statement that he wanted to hire someone to kill Ms. Good. *Id.*

5. After Deputy Houlton prepared an incident report detailing Ms. Good's telephone call, Defendant Prentice was assigned to the investigation. *Id.* at 5.

6. During his investigation, Defendant Prentice confirmed that Luis Ramirez had been arrested on September 15 as a result of a domestic dispute with his stepson, and that he was currently incarcerated in the Santa Fe County Adult Detention Facility. *Id.*

7. Defendant Prentice interviewed Norma Ramirez on the following day, September 16, 2013, regarding the alleged threat against Ms. Good. *Id.* at 5.

8. During that interview, Norma Ramirez confirmed the following:

   a. She overheard her husband, Luis Ramirez, talking to a third party about attempting to find someone to kill Ms. Good. *Id.*

   b. Luis Ramirez had been arrested on September 15, 2013. *Id.*

   c. Norma Ramirez called Ms. Good on September 15, 2013 after her husband's arrest to inform Ms. Good of the conversation she overheard. *Id.*

   d. The conversation regarding killing Ms. Good had taken

place at some earlier point in time, but Norma Ramirez

waited to inform Ms. Good of the threat because she was

afraid of Luis. *Id.*

e.    When Norma confronted Luis about overhearing the

conversation, he threatened to kill Norma if she reported

what she heard to the police or to Ms. Good. *Id.*

f.    Luis was a violent alcoholic who had threatened Norma

with violence before. *Id.* at 6.

g.    Norma was planning to divorce Luis once he was released

from jail, and the couple would no longer be sharing a home.

*Id.*

9.  Plaintiff Norma Ramirez informed Defendant Prentice that Luis Ramirez

kept two rifles and a gun in the Ramirez home during the September 16

interview. *Id.*

10. Luis Ramirez was released from custody on September 17, 2013. *Id.*

11. Ms. Good informed Defendant Prentice on October 24, 2013 that Norma

Ramirez had failed to appear at a hearing to testify regarding the threat

she overheard Luis Ramirez make against Ms. Good's life, and that a

bench warrant was issued for Norma's arrest. *Id.*

12. Ms. Good expressed concern that Luis Ramirez had kept his wife from testifying. *Id.*

13. Defendant Prentice confirmed that Norma Ramirez failed to comply with a subpoena compelling her testimony on October 11, 2013, and the state District Court issued a bench warrant for Norma Ramirez's arrest that same day. *Id.*

14. Defendant Prentice verified that the bench warrant for Norma Ramirez's arrest was active and facially valid on October 24, 2013. *Id.*

15. Defendant Prentice went to the Ramirez home at 4804 Golden Ray Circle in Santa Fe, New Mexico on October 24, 2013 at 10:00 AM in order to execute the warrant, along with two other sheriff's detectives. *Id.* at 6-7.

16. Defendant Prentice was aware that there had been, and possibly still were, multiple firearms at 4804 Golden Ray Circle. *Id.* at 7.

17. While loudly knocking on the front door several times and announcing themselves as employees of the Sheriff's Department, the detectives noticed someone inside the Ramirez home look at them from behind an upstairs window curtain and quickly move away from the window. *Id.*

18. Following several failed attempts to gain consensual entry by knocking and announcing themselves, the sheriff's detectives requested the

assistance of Sheriff's Warrants/Fugitives Agents Defendant Eddie Webb and Defendant Brian Nissen. *Id.*

19. After Defendants Webb and Nissen arrived at the home, they also knocked and announced themselves at the front door of the Ramirez home several times, but could not gain entry. *Id.* at 8.

20. Defendants Webb and Nissen gained entry to the garage by using a garage door opener that they found in the Ramirez family car, and they then entered the Ramirez home through a door inside the garage. *Doc. 45* at 3.

21. The agents' entry into the Ramirez home for the purpose of executing a facially valid bench warrant against Norma Ramirez was not an illegal or unconstitutional entry. *See doc. 33.*

22. After gaining entry to the Ramirez home, Defendants Webb and Nissen repeatedly called out Norma Ramirez's name and announced that they were from the Sheriff's Department. *Doc. 30* at 4; *doc. 41* at 8.

23. In response to hearing the officers call her name, Norma Ramirez appeared at the top of the stairs, shouting "please don't shoot me!" and raising her hands in the air. *Doc. 30* at 4.

24. Either Defendant Webb or Defendant Nissen then shouted, "God damn it, we were about to start shooting!" *Id.*

14

25. Norma Ramirez then descended the stairs with her hands raised while Defendants Webb and Nissen held her at gunpoint. *Id.*; *see also doc. 41* at 8.

26. Defendant Prentice entered the house, advised Norma Ramirez of the active bench warrant for her arrest, and gave her the name of the issuing judge. *Id.*

27. Either Defendant Webb or Defendant Nissen patted down Norma Ramirez and then placed her in handcuffs by quickly spinning her around and pushing her against the wall. *Id.* at 9; *doc. 30* at 4; *doc. 45* at 4.

28. Norma Ramirez did not physically resist the arrest at any point. *See generally doc. 41* at 8-9; *see also doc. 45* at 4.

29. One of the officers asked Norma Ramirez whether any other people were present in the home, and she informed them that her husband and daughter, Plaintiffs Luis Ramirez and Jackie Montijo, respectively, were upstairs. *Doc. 41* at 8.

30. Either Defendant Webb or Agent Nissen called for Plaintiffs Luis Ramirez and Jackie Montijo to come downstairs one at a time. *Doc. 41* at 8.

31. Plaintiff Jackie Montijo descended the stairs first with her hands raised, while Defendant Webb and Agent Nissen held her at gunpoint. *Doc. 30* at 4

32.  Once Plaintiff Montijo reached the bottom of the stairs, she was told to
lower her hands, and no force of any kind was used against her thereafter.
*Doc. 30* at 4; *doc. 41* at 9; *see generally docs. 30, 41, 45.*

33. Plaintiff Luis Ramirez descended the stairs with his hands raised, while
Defendant Webb and Agent Nissen held him at gunpoint.  *Doc. 30* at 5.

34. Once Plaintiff Luis Ramirez reached the bottom of the stairs, he was told
to lower his hands, and no force of any kind was used against him
thereafter.  *Doc. 41* at 9; *see generally docs. 30, 41, 45.*

35. The officers put away their firearms once every member of the family was
downstairs.  *Doc. 41* at 9.

36. Norma Ramirez was then transported to the Sheriff's Office to be
interviewed by Defendant Prentice and another detective regarding the
matter in which she failed to appear to testify.  *Doc. 41* at 9.

37. Five to ten minutes passed between the initial entry into the house and the
time the officers left with Norma Ramirez in custody.  *Doc. 41* at 9.

## V.  ANALYSIS

1. *The individual Defendants are entitled to qualified immunity on Plaintiffs'
   excessive force claim based on the "clearly established" prong.*

In their motion, the individual Defendants explicitly move for summary

judgment on the basis of qualified immunity.  *See doc. 41* at 1-3.  In so doing, they

expressly and correctly state that "[o]nce an individual defendant asserts qualified

immunity (as is the situation here), the burden shifts and the plaintiff must come

forward with sufficient evidence to establish two prongs: that the defendant's alleged

conduct violated the law, and that the law violated was clearly established when the

violation occurred." *Id.* at 3 (citing *Pueblo Neighborhood Health Centers, Inc. v. Losavio*, 847

F.2d 642, 645-46 (10th Cir. 1988)). Despite being advised of this burden, Plaintiffs'

response makes no effort to satisfy the "clearly established" prong. While Plaintiffs

contest Defendants' reliance on two cases,[4] they point to no case to demonstrate that the

alleged constitutional violation committed by the officers was contrary to clearly

established law. *See generally doc. 45*. In fact, the response fails to mention the term

"clearly established." *Id*. Instead, Plaintiffs argue that "[n]owhere have Defendants

presented any solid laws or cases granting qualified immunity to officers" in a case with

similar underlying facts. *Id*. at 7. However, as noted above, the burden to come

forward with cases demonstrating that the violation was contrary to clearly established

law rests with Plaintiffs. They utterly fail to meet that burden. As such, the individual

Defendants are entitled to qualified immunity. *See Gutierrez v. Cobos*, 841 F.3d 895, 901-

03 (10th Cir. 2016); *see also Rojas v. Anderson*, 727 F.3d 1000, 1003-04 (10th Cir. 2013);

*Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013).

---

[4] *See doc. 45* at 6-7 (discussing *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) and *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002)),

2. *The municipal Defendant is entitled to summary judgment because no constitutional violation has been established.*

"[U]nlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993). Thus, the finding that the individual Defendants are entitled to summary judgment on the basis of qualified immunity does not automatically dispose of the claim against the municipal Defendant. It is true that "a municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Green v. Post*, 574 F.3d 1294 (10th Cir. 2009) (quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)). However, the Court has not yet addressed whether there was any underlying constitutional violation committed by the officers in this case. Rather, the decision to dismiss the individual Defendants rests entirely on Plaintiffs' failure to carry their burden in defeating the qualified immunity defense. It is possible for an officer to escape liability on the basis of qualified immunity and for the officer's employing municipality to nevertheless be liable for a constitutional violation. *See Bass v. Pottawatomie Cty. Pub. Safety Ctr.*, 425 F. App'x 713, 717-18 (10th Cir. 2011); *Boyd v. Montezuma Cty. Sheriff's Office*, No. 15-CV-00101-MEH, 2015 WL 2329061, at *1 (D. Colo. May 13, 2015) (discussing the relevant jurisprudence on the question of whether municipal liability may obtain despite the grant of qualified immunity to all individual defendants); *Starkey ex rel. A.B. v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244, 1263 n.4 (10th Cir. 2009) ("We recognize that judgment in

18

favor of the individual Defendants in their personal capacities would not necessarily

bar a claim against [the municipal employer] (or the individual defendants in their

official capacities).").

Thus, the Court will now address whether, under the standards applicable to

non-qualified immunity summary judgment motions, a genuine issue of material fact

exists as to whether the officers effecting the arrest of Norma Ramirez used

unconstitutional excessive force against any of the Plaintiffs.

As a preliminary matter, Plaintiffs Luis Ramirez and Jackie Montijo rest their

excessive force claims solely on the officers' act of holding them at gunpoint during the

encounter.  They do not allege that the officers used any other force against them.

"[T]he use of a gun does not in and of itself make an encounter an unlawful seizure."

*Lundstrom v. Romero*, 616 F.3d 1108, 1121 (10th Cir. 2010).  However, "the pointing of

firearms should be predicated on at least a perceived risk of injury or danger to the

officers or others, based upon what the officers know at that time."  *Id.* (internal citation

and alterations omitted); *see also Holland*, 268 F.3d at 1192.  Moreover, "[p]ointing a

firearm directly at a child calls for even greater sensitivity to what may be justified or

what may be excessive under all the circumstances."  *Id.* at 1193.  As with any excessive

force claim, the pertinent question in determining the reasonableness of the use of

weapons by officers is whether the officers acted reasonably in light of the "totality of

the circumstances as viewed from the perspective of a reasonable officer on the scene."

*Lundstrom*, 616 F.3d at 1121; *see also Graham*, 490 U.S. at 396 ("the question is whether the totality of the circumstances justifies a particular sort of seizure" (citation and internal alterations omitted)); *Medina*, 252 F.3d at 1132.  With these principles in mind, the Court will address the claims of the adult Plaintiffs separately from the claim of Plaintiff Jackie Montijo, who was eleven years old at the time of her mother's arrest.

        i.     *The officers did not use excessive force against Plaintiffs Luis and Norma Ramirez.*

While it is true that "force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest," such as Plaintiff Norma Ramirez, *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007), other considerations weigh in favor of finding that the force used by the individual Defendants was reasonable. "Although the severity of the alleged offense is a factor in evaluating an excessive force claim, a court must also consider officer safety concerns and whether the suspect cooperates or resists." *Cortez*, 478 F.3d at 1128.  Here, the arresting officers had valid reason both to be concerned for their safety and also to believe that Norma Ramirez did not intend to cooperate.

As to suspect cooperation or resistance, the residents of the home did not allow the police officers to enter voluntarily.  Suspect Norma Ramirez refused to open the door despite several attempts by the uniformed officers to knock and announce themselves at the front door, including the announcement that their purpose was to execute an arrest warrant against her.

As to safety concerns, the officers had reason to believe that people other than the suspect were present inside the home, and that at least one occupant of the home had access to firearms and was prone to violence.   The officers were aware that Plaintiff Luis Ramirez owned two rifles and a gun, which he kept in the home where they were effecting the arrest.  The officers were aware that Norma Ramirez had reported that Luis Ramirez recently engaged in efforts to have his ex-wife killed.  Finally, the officers knew that Norma Ramirez reported being afraid of Luis and that Luis had an extensive history of threats, violence, and domestic abuse, including a domestic violence arrest only six weeks prior to the incident at issue.  *Cf. Cortez*, 475 F.3d at 1128 (there is no indication that a suspect is resisting or attempting to evade arrest where he opens the door of his residence to police voluntarily, nor is there any indication of a threat to the officers' safety where "[n]othing suggests that the Plaintiffs were armed or that other persons besides the Plaintiffs were present."); *see also Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016) (noting that force may not be justified by officer safety concerns and may be excessive where "there is no evidence that [an arrestee] had access to a weapon or that she threatened harm to herself or others.").

Although Norma Ramirez was not suspected of a violent crime, concerns about officer safety were nonetheless reasonable in light of the likely presence of firearms in the home, the strong possibility that a person with a known history of violence was an occupant of the home, and the occupants' refusal to open the door to the arresting

officers.  *See Cortez*, 478 F.3d at 1128; *see also In re Estate of Bleck ex rel. Churchill*, 643 F.

App'x 754, 756 (10th Cir. 2016) (collecting cases in noting that "we do have a good deal

of precedent indicating that officers may unholster their weapons when they enter

potentially dangerous situations").

The Court must "assess objective reasonableness based on whether the totality of

the circumstances justified the use of force, and pay careful attention to the facts and

circumstances of the particular case." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d

1255, 1260 (10th Cir. 2008) (citation omitted).  It was "objectively reasonable" from "the

perspective of a reasonable officer on the scene" for the officers to ensure their own

safety by keeping their weapons drawn until all of the occupants of the home were

within the area of their immediate control and confirmed to be unarmed and

cooperative.  *See Graham*, 490 U.S. at 397, 396.

The sole physical contact between the officers and any of the Plaintiffs was an

officer's pat-down of Norma Ramirez followed by spinning her around abruptly and

pushing her against the wall to place handcuffs on her.  "Our Fourth Amendment

jurisprudence has long recognized that the right to make an arrest . . . necessarily carries

with it the right to use some degree of physical coercion or threat thereof to effect it."

*Id.* at 396.  "[P]olice have historically been able to use more force in making an arrest

than in effecting an investigative detention." *Cortez*, 478 F.3d at 1126.  Moreover, a

claim of excessive force based on handcuffing "requires some actual injury that is not *de minimis*, be it physical or emotional." *Id.* at 1129.

Plaintiff Norma Ramirez does not allege any physical injury as a result of the handcuffing, and her allegation of emotional injury is limited to being "terrified" both before and while descending the stairs and having been caused "great emotional distress" when an officer shouted that they "were about to start shooting." *See doc. 45-1* at 1-2; *see also doc. 41-7* at 4 (in response to whether she was "hurt [] physically in any way," Norma Ramirez testified during her deposition that "I do remember I feel so bad because I was only a witness, and they don't have the right to enter into my house to arrest me"). She alleges no emotional injury specifically as a result of the handcuffing, arguing instead that the violence with which she was spun around and pushed against the wall constituted excessive physical force. *See generally docs. 30, 45*; *see also doc. 45-1* at 2. That claim is not supported by the relevant jurisprudence. *See, e.g., Cortez*, 478 F.3d at 1129 (no claim for excessive force based on handcuffing where the handcuffs were so tight as to leave red marks that were visible for days afterward); *Segura v. Jones*, 259 F. App'x 95, 103-04 (10th Cir. 2007) (no excessive force where a 370-pound officer pushed a female shoplifting suspect "against the wall in order to place the handcuffs on her" even though the arrestee's face hit the wall, because "there were no visible marks, cuts or abrasions on her face"). Therefore, Plaintiff Norma Ramirez has failed to create a triable fact as to whether the officers used unconstitutional excessive force against her

by pointing loaded firearms at her, or by abruptly spinning her around and pushing her against the wall.

The same analysis applies to Plaintiffs' claim that the officers used excessive force against Luis Ramirez. Although Luis was not the person officers sought to arrest, he was known to the officers to be prone to violence and to have access to firearms in the home. In the context of protective sweeps incident to a lawful arrest, the Supreme Court has explained that "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." *Maryland v. Buie*, 494 U.S. 325, 333 (1990). Therefore, officers executing an arrest warrant in a suspect's home have an interest "in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.* This rule from *Buie* applies to protective detentions in addition to protective searches, because "the ability to search for dangerous individuals provides little protection for officers unless it is accompanied by the ability to temporarily seize any dangerous individuals[.]" *United States v. Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004). Thus, "detaining potentially dangerous persons for the duration of [an] arrest qualifies as a reasonable step to ensure the officers' safety." *Id.* (internal citation omitted). *See also Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1073 (10th Cir. 2010) ("[W]hen

officers lawfully arrest one occupant, officers may stop co-occupants as part of a *Buie*

sweep.").

Arresting Plaintiff Norma Ramirez in her home put the officers "at the

disadvantage of being on his adversary's 'turf.'  An ambush in a confined setting of

unknown configuration is more to be feared than it is in open, more familiar

surroundings." *Buie*, 494 U.S. at 333.  Such reasonable fear of ambush was only

magnified in this case by the suspect's apparent unwillingness to exit her home and

cooperate with the execution of the warrant for her arrest; as a result, the officers were

forced to enter "a confined setting of unknown configuration" in order to carry out the

arrest.  Further adding to officer safety concerns was their knowledge that there were

firearms in the home, as already discussed.  It was therefore reasonable in light of

officer safety concerns to hold Luis Ramirez at gunpoint until he was within the area of

the officers' immediate control.  Accordingly, there is no genuine issue of material fact

as to whether his constitutional rights were violated.

> ii.    *The officers did not use excessive force against Plaintiff Jackie Montijo.*

Plaintiffs allege that at least two officers pointed loaded firearms at eleven-year-

old Jackie Montijo as she descended the stairs.  Holding minor children at gunpoint for

a sustained period of time may constitute unlawful excessive force under the Fourth

Amendment.  *See Holland*, 268 F.3d at 1192-93 (10th Cir. 2001); *Maresca v. Bernalillo Cty.*,

804 F.3d 1301, 1314 (10th Cir. 2015).  However, there is no allegation that any officer

held Plaintiff Jackie Montijo at gunpoint for a sustained period of time, that any physical contact occurred between Montijo and any of the officers, or that the any officer continued to hold Montijo at gunpoint after having gained complete control of the situation.

In *Holland*, SWAT team officers held three people, including an eight-year-old boy, at gunpoint for ten to fifteen minutes while they were lying face-down on the ground, and trained a laser-sighted weapon on the back of a fleeing four-year-old girl. 268 F.3d 1183-84, 1192.  In affirming the denial of summary judgment to the defendants, the *Holland* court explained:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.  Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at the time . . . .  Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.  Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.

268 F.3d at 1192-93.  The court went on to acknowledge that "the SWAT Team's initial show of force may have been reasonable under the circumstances," but explained that "continuing to hold the children directly at gunpoint after the officers had gained complete control of the situation . . . was not justified[.]"  *Id.* at 1193.

In *Maresca*, police officers conducted a felony stop of a vehicle containing two adults and their three minor children. 804 F.3d at 1304-06. The plaintiffs alleged that officers continued pointing their firearms directly at a minor child and the mother after all plaintiffs were lying prone on the ground in accordance with the officers' instructions. *Id.* at 1306. Relying on *Holland*, the Tenth Circuit found that the plaintiffs' factual allegations could be "exactly" likened to the fact pattern in *Holland* where "the officers continued to hold minors at gunpoint after they had been subdued," creating the requisite genuine dispute of material fact to justify reversal of summary judgment. 804 F.3d at 1314-15.

Thus, the Tenth Circuit in both cases determined that summary judgment on the basis of qualified immunity is not appropriate in an excessive force case where officers continued holding minor children at gunpoint *after* the officers had already gained control of the situation and had no reason to believe the children posed any danger. Here, Plaintiffs do not allege that Jackie Montijo was held at gunpoint—or subject to any other type of force—at any time after she descended the stairs and was within the area of the officers' immediate control.

Moreover, one of the key factors in assessing an excessive force claim is "whether the officers had reason to fear for their safety or the safety of others." *See, e.g., Fisher v. City of Las Cruces*, 584 F.3d 888, 895 (10th Cir. 2009) (applying the *Graham* factors). At the time Plaintiff Montijo was descending the stairs, the officers were aware that (1)

Plaintiff Luis Ramirez was still upstairs; (2) at least three firearms were present in the home; and (3) Luis Ramirez could appear on the stairs at any time as Plaintiff Montijo descended.  The officers therefore had not yet gained control of the situation and were rightfully concerned with officer safety.  Even if it was unreasonable to believe that Plaintiff Montijo alone posed a threat of danger, the officers had reason to believe that a dangerous situation could arise on the stairwell at any moment given that Plaintiff Luis Ramirez, whom they knew to have a history of violence and access to multiple firearms, was upstairs and outside of their control.  *See Buie*, 494 U.S. at 333 (discussing the risk of unexpected ambush by non-suspect occupants of a home).  Their show of force was therefore "predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers [knew] at that time."  *Holland*, 268 F.3d at 1192.

Therefore, Defendants have shown an absence of evidence to support Plaintiffs' claim that a constitutional violation occurred.  In response, Plaintiffs have failed to designate specific facts showing any genuine issue of material fact regarding that claim.  Consequently, the municipal Defendant is entitled to summary judgment.[5]

---

[5] As noted above, establishing municipal liability requires proof of both the violation and a policy/custom which was the moving force behind the violation.  *See supra* pp. 7-8.  The summary judgment record contains no evidence of such a policy/custom.  However, because Defendants did not make that argument and, in the context of a non-qualified immunity summary judgment motion, the burden is on the municipal Defendant to demonstrate the absence of a material fact, the Court does not rely on this apparent deficiency.

3.  *The individual Defendants are entitled to summary judgment because no constitutional violation has been established.*

Given this conclusion, the Court will briefly return to the question of qualified immunity for the individual Defendants.  Above, the Court found that Plaintiffs failed to carry their burden of demonstrating that the relevant law was clearly established.  With the Plaintiffs having failed to satisfy this prong of the qualified immunity standard, the individual Defendants are entitled to qualified immunity.  The Court has now concluded, under the typical summary judgment standard where the burden is on non-movant, that no reasonable jury could find a constitutional violation by the officers based on the summary judgment record.  This conclusion dictates that Plaintiffs have also failed to satisfy the remaining prong of the qualified immunity analysis.  Therefore, in the alternative, the Court finds that the individual Defendants are entitled to qualified immunity based on Plaintiffs' failure to demonstrate a constitutional violation.

## VI.   CONCLUSION

Based on the foregoing, Defendants Prentice and Webb are entitled to qualified immunity, and Defendant Board of County Commissioners of Santa Fe County is entitled to summary judgment based on the absence of evidence in the record from which a reasonable jury could conclude that Plaintiffs' Fourth Amendment right against unreasonable seizure was violated.  Accordingly, Defendants' Motion for Summary Judgment (*doc. 41*) is GRANTED.  As the Court has already dismissed Counts II, IV, and the state law portion of Count I of the Amended Complaint as to all Defendants, and

Count V as to the municipal Defendant (*doc. 34* at 9), the federal portion of Count I,

Count III, and Count V as to the individual Defendants are Plaintiffs' only remaining

claims.  Those remaining claims are hereby DISMISSED WITH PREJUDICE.

Additionally, Plaintiffs' claims against putative Defendant Brian Nissen are

DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**